## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-DP-00507-SCT

*BENNY JOE STEVENS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/04/1999 |
| TRIAL JUDGE: | HON. MICHAEL R. EUBANKS |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MORRIS SWEATT, SR. |
| | J. C. AINSWORTH, JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| DISTRICT ATTORNEY: | CLAIBORNE McDONALD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 09/13/2001 |
| MOTION FOR REHEARING FILED: | 9/25/2001; denied 2/14/2002 |
| MANDATE ISSUED: | 2/21/2002 |

### EN BANC

### EASLEY, JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. On January 12, 1999, Benny Joe Stevens ("Stevens") was indicted in Marion County on four counts of capital murder and one count of aggravated assault. The indictment charged that on October 18, 1998, Stevens murdered the four people while in the course of a burglary and felonious child abuse: Count I, Wesley Reed a/k/a Wesley Reid ("Wesley"); Count II, Glenda Reed a/k/a Glynda Reid ("Glenda"); Count III, Heath Pounds ("Heath"), a child; and Count IV, Dylan Lee ("Dylan"), a child. The indictment also charged in Count V that Stevens committed aggravated assault of Erica Stevens a/k/a Ericka Stevens ("Erica").

¶2. On March 31, 1999, the trial court granted Stevens's motion for a change of venue from Marion County filed on February 9, 1999. The trial was moved from Marion County to Madison County. The jury selection began on November 29, 1999.

¶3. On December 3, 1999, the jury returned guilty verdicts on all five counts: four counts of capital murder under Miss. Code Ann. § 97-3-19(2) and one count of aggravated assault under Miss. Code Ann. § 97-3-7(2).

¶4. The jury sentenced Stevens on December 4, 1999, and imposed the death penalty on counts I - IV, relating to Wesley, Glenda, Heath and Dylan. The trial court further sentenced Stevens to twenty years in prison on the aggravated assault conviction, relating to Erica.

¶5. Stevens filed a Motion for a New Trial or in the Alternative J.N.O.V. on December 14, 1999, which was denied on January 4, 2000.

¶6. Stevens filed a notice of appeal to this Court on January 14, 2000.

## FACTS

¶7. Four brutal murders of Wesley, Glenda, Heath and Dylan and one aggravated assault of Erica, took place on Sunday, October 18, 1998, in Marion County.

¶8. Erica is the daughter of Stevens. At the time of trial, Erica was only seventeen years old and had been living with her aunt, Gaye Chambliss. Erica has a sister named Angela Dawn Stevens, ("Angel"), who was nineteen years old at the time of trial. Erica and Angel were both the daughters of Stevens and Glenda.

¶9. On October 18, 1998, Erica lived with her mother, Glenda, with her step-father, Wesley, and her brother, Dylan, in a single-wide trailer home in Marion County located on Shiloh Firetower Road in Foxworth, Mississippi. There were bad feelings between Stevens and Glenda. Glenda and Stevens divorced when Erica was approximately three years old. Stevens came back into Erica's life when she was around twelve years old.

¶10. Lauren Stevens ("Lauren"), present wife of Stevens, testified that she and Stevens had married in 1993. Stevens received custody of his daughters, Erica and Angela, in September of 1996. However, in August of 1998, Glenda regained custody of Erica. Erica had wanted the custody arrangement changed, and Erica signed the paperwork to change custody to her mother, Glenda. Stevens and Glenda had disputes over child support. The last time Stevens and Glenda had been in the same room was at court for the child support. Lauren testified that Glenda and Stevens were having domestic problems. Lauren testified on sentencing that a set of papers regarding child support had been delivered to Stevens about a month before the murders on October 18, 1998. Stevens was expecting a settlement from a back injury. Lauren testified that Stevens expected that he would have to pay a large sum of money to Glenda for past due child support from the settlement check.

¶11. At the time of the murders, Stevens was unemployed and had a worker's compensation claim due to an alleged back injury. Stevens's wife, Lauren, was also unemployed. Lauren testified that Stevens' alleged injury occurred January of 1993, while working on a land ring. Since the accident, Stevens increased his drinking and was also taking medication: Lorcet 10's, Somas and Xanax. Stevens's drinking increased after his second back surgery in either 1995 or 1996.

¶12. On Sunday, October 18, 1998, Stevens and his brother, Ricky Stevens ("Ricky"), had gone in Stevens's beat up, white Ford pick-up truck to play pool. They left Stevens's home together around lunchtime. Lauren received a telephone call from Ricky on a cell phone around three o'clock in the afternoon. Stevens and Ricky had run into a ditch and wrecked the truck. Stevens appeared drunk to Lauren when she arrived to assist them. Stevens's truck was pulled out of the ditch, and Stevens went back home. Stevens fell asleep on the couch after returning home and awoke later hungry. After falling back to sleep, Stevens got up and ate. Ricky was passed out, and Stevens tried to wake him up to go lie down in the bedroom. Ricky moved onto the porch and ate. Stevens went to bed.

¶13. Lauren saw the light on in Stevens's bedroom under the door and heard movement in the room. When

Lauren entered the bedroom, she saw Stevens with his gun belt laid out on the bed. Stevens was putting shotgun shells in the gun belt. Lauren remembered seeing his .357 handgun. Lauren tried to stop Stevens from leaving the house. During this time, Julie Hollinger ("Hollinger") had appeared on the porch and was standing at the door. Hollinger was an acquaintance of Lauren. Stevens went back into the bedroom. Stevens did not turn on the light. Ricky was still on the porch talking to Hollinger. Hollinger stayed on the porch with Ricky a few minutes. As soon as Hollinger left, Stevens ran out of the house and left in his beat up, white Ford truck. Stevens had taken his guns with him. Lauren stated to Ricky, "I think he's messing up. I think you need to stop him."

¶14. On Sunday, October 18, 1998, Erica had slept late and had gotten up between twelve and one o'clock that afternoon. Dylan's twelve-year-old friend, Heath, was visiting at the Reed home. Erica had joined Dylan and Heath playing Nintendo. Erica's sister, Angel, was at church with her boyfriend, Nathan Carney.

¶15. Erica, Heath, Wesley, Glenda and Dylan were all at the trailer and had finished eating supper. Heath was not spending the night. Heath was to be taken home after they had cleaned up. Erica was cleaning the supper dishes when she heard a motor she recognized. Erica was standing in the kitchen looking out the kitchen window above the sink. She saw Stevens park his truck beside Wesley's truck in the backyard, No one was with Stevens. Erica saw Stevens get out of his truck. The trailer had a sliding glass door on the back of the trailer with steps leading up to the entrance.

¶16. Wesley opened the sliding glass back door only wide enough to stick his head out the door. Wesley yelled out, "Benny Joe, Can I help you ?" Erica then heard a gunshot and Wesley scream, "[S]hit, he shot me." Erica saw Wesley had been shot in the arm and had fallen down to the floor.

¶17. Erica then ran to get Dylan and Heath up from playing Nintendo in the living room. She headed toward her mother's bedroom. Glenda was in her bedroom watching television. Glenda's bedroom and the living room were to the left of the back door. Erica could not get the door open to her mother's room. Erica was shot in the back and fell through the doorway into the bedroom. Heath and Dylan screamed when Erica was shot.

¶18. Glenda jumped up to inquire as to what was happening and told Erica to hide. Erica hid in the stand-up shower in that bedroom. The bedroom and bathroom were connected with no door between them.

¶19. Erica saw her mother grab her gun and hold it to her chest. Glenda was shaking and was standing in front of the chifforobe. Glenda screamed that "he [Stevens] couldn't have her babies." Erica heard another gunshot and saw her mother jerk from the shot. Erica could not hear Dylan or Heath anymore.

¶20. Erica heard Stevens say after shooting Glenda, "[B]itch, I told you that I'd kill you one of these days." Erica came out of the shower and saw Stevens going through the bedroom. Erica saw Stevens leave her mother's bedroom, but she did not see him enter the bedroom. Erica testified that Stevens was wearing his "John Wayne" belt.

¶21. Erica could hear Wesley yelling everybody's name asking somebody to call 911 and asking God to help him. Erica went through the small window in the bathroom where she had been hiding. Erica hid under the trailer directly under the window afraid to move from her location. She heard more gunshots in the trailer. She continued to hear shots while she was running away from the trailer. Erica went to a neighbor's

house for help. The neighbor was Ora Mae Pittman. Erica beat on Ora Mae Pittman's door and collapsed at the door. Ms. Pittman had just gotten off work where she was employed at the Mississippi State Department of Youth Services in Columbia. Ms. Pittman's boyfriend, Larry Green, her nephew and her son were also home.

¶22. Ms. Pittman described that Erica appeared to have been shot in the back. Her white t-shirt had holes and spots of blood. Erica told them that her father had shot her mother, step-father, brother and friend. Ms. Pittman described that they were all afraid and Erica appeared to be scared. Erica was afraid that Stevens had followed her to Ms. Pittman's house. Ms. Pittman's boyfriend and son armed themselves and released the dogs. Erica used the telephone to call 911 and to warn Heath's mother and her sister's boyfriend's father. Erica wanted to prevent someone from going into the trailer with Stevens still there.

¶23. Erica was transported from Ms. Pittman's house to the hospital by ambulance. Photographs were taken of Erica's injuries. Pellets were imbedded in Erica's back. The gunshot wounds to Erica's back caused permanent scars in her back, and five unremovable pellets remained permanently lodged in her shoulder blade. Erica remained in the hospital for six days.

¶24. Stevens left the trailer and headed back home. When Stevens arrived home, Lauren and Ricky were on the porch. Lauren stated that it was getting dark outside when Stevens arrived back home. While on the porch, Lauren asked Stevens, "[W]hat did you do?", to which Stevens replied, "I just killed a family." Lauren then heard Ricky gasp. Stevens handed Glenda's gun to Lauren.

¶25. Lauren went to her brother's, Buck White ("Buck") house. Lauren told Buck what had happened. Lauren called attorney, Jim Rhoden ("Rhoden"), for advice. Stevens had used Rhoden in the past for domestic legal matters. Rhoden recommended they needed a criminal lawyer and recommended criminal attorney Morris Sweatt ("Sweatt"). Rhoden advised that he would help Stevens surrender, and he would try to find out what he could. In order to talk to Lauren, Stevens went out to Buck's house. After talking with Lauren, Stevens left and later returned to Buck's house. Stevens had gone to Rhoden's office, but no one was there.

¶26. Lauren testified after Stevens returned, two cars pulled up at Buck's house. Rhoden was in one of the cars. Stevens was taken into custody by the police.

¶27. On one of Lauren's jail visits with Stevens, Lauren told Stevens she needed money and wanted to have trees cut off of the 56 or 57 acres they owned. Stevens' workers compensation checks had been discontinued. Stevens told Lauren, "[N]o, don't do that." Stevens finally said, "[Y]ou're gonna hang me."

¶28. Stevens explained to Lauren that he had hidden the shotgun he used in the trees on their property. Lauren found the shotgun lodged up in a tree and called her friend, Angela Pittman. When Angela Pittman arrived, Lauren paged officer Tim Singley ("Singley"), an investigator at the Marion County Sheriff's Department on his beeper. All three went together to locate the shotgun.

¶29. Singley located and retrieved the shotgun hanging approximately thirty feet up in the tree at a fork in the limb. The shotgun was identified as a Winchester 12-gauge double-aught shotgun.

¶30. A search warrant was obtained to search Stevens's truck. Three spent shotgun shells, two .357 magnum weapons, one bandolier ammunition belt containing ten live shotgun shells and a .22 magnum derringer were found in Stevens's truck. A .357 magnum was found in Stevens's truck door panel. The two

projectiles removed from Wesley's body matched the .357 magnum found in Stevens' truck.

¶31. A few days after his arrest, Stevens told authorities that there was a weapon hidden behind Rhoden's law office. The authorities recovered a .45 caliber pistol and three fully loaded clips from behind the office.

¶32. Ballistic testing performed by Steve Byrd, forensic scientist for the Mississippi Crime Laboratory, showed the spent shotgun shells found at the crime scene were discharged from the shotgun removed by Singley from the Stevens's property. The shotgun had the capacity to hold five shells, four in the magazine, plus one in the chamber.

¶33. Joe Edward Andrews, Jr. ("Andrews"), an expert in forensic science with the Mississippi Crime Laboratory, examined the athletic shoes worn by Stevens on October 18, 1998, Andrews examined the wooden steps removed from the back door of the Reed's trailer. The wood steps were covered in blood with a footprint impression. Andrews testified that the two impressions can be positively identified as being produced by Stevens's right and left soles of the shoes Stevens was wearing at the time arrested.

¶34. When the sheriff's department arrived at the gruesome, bloody crime scene, they discovered the following: Wesley's body in the kitchen; Dylan's body in the doorway between the hall and the bedroom with the top of his head blown off; Glenda was found in a kneeling position in the bedroom with a rear-entry head wound; and Heath's body covered in blood behind the bed. Heath's injuries could not be seen initially because of the blood. Shotgun shell casings were recovered at the scene.

¶35. Wesley had been shot four times leaving two different types of wounds made by two different weapons. The four gunshot wounds consisted of two from a shotgun and two from a large caliber handgun. Wesley had a 5 inch gaping, non-lethal shotgun wound to the front, right shoulder, which fractured the shoulder bones and appeared to have been inflicted from 6-8 feet away. He had a shotgun wound to the left side of the face, involving the left cheek. This injury caused "massive fractures" to the skull, "extensive injuries to the brain", and it was a lethal injury. However, the autopsy revealed that death could have been delayed for a period of time. Wesley also received another gunshot wound at "near contact" from a large caliber copper-jacketed bullet found in the stomach. In addition, Wesley had a "near contact perforating gunshot wound" to the chest, which was also inflicted by a large caliber weapon. A copper-jacketed, large caliber bullet was recovered in his body at the lower left chest wall. Wesley was 38 years old when he died.

¶36. Glenda suffered a straight, gaping shotgun wound to the back of her head that measured 4 inches in diameter. There was extensive injury, fracturing, and bleeding of the brain and the skull. This injury was fatal, and it was inflicted from a distance of 4-5 feet. Glenda was 38 years old when she died.

¶37. Dylan also suffered a lethal shotgun wound to the back of the head. Some pellets exited through his left eye, left ear, and nose, however, most of the shot was in the cranial vault. Dylan was eleven years old when he died.

¶38. Heath had a non-lethal shotgun wound to the face. The autopsy also indicated that Heath was in a defensive posture with his hand raised. He then received a fatal shotgun blast to the chest which caused extensive injury to his heart, aorta, and right lung and also severed his spine. Heath was twelve years old when he died.

## STATEMENT OF ISSUES

**I. WHETHER IT WAS ERROR FOR THE COURT TO DENY BENNY JOE STEVENS'S MOTION FOR SEVERANCE OF THE MULTIPLE COUNTS IN THE INDICTMENT?**

**II. WHETHER IT WAS ERROR FOR THE COURT TO PROCEED UNDER THE INDICTMENT WHICH CONSTITUTED A VIOLATION OF THE DOUBLE JEOPARDY DOCTRINE AND THE "VAGUENESS DOCTRINE"?**

**III. WHETHER THE STATE ABUSED THE RIGHT OF PEREMPTORY CHALLENGE IN THIS CASE UNDER THE PRINCIPLES OF THE *BATSON* CASE?**

**IV. WHETHER THE COURT VIOLATED THE HUSBAND AND WIFE PRIVILEGE?**

**V. WHETHER IT WAS ERROR FOR THE COURT TO DENY THE TESTIMONY OF THE DEFENSE EXPERT IN THE GUILT PHASE OF THE TRIAL ON THE ISSUE OF DEFENDANT'S ABILITY TO FORM SPECIFIC INTENT?**

**VI. WHETHER THE CAPITAL PUNISHMENT SCHEME IS UNCONSTITUTIONAL?**

**VII. WHETHER IT WAS ERROR FOR THE COURT TO DENY STEVENS'S MOTION TO DELAY THE SENTENCING PHASE?**

**VIII. WHETHER IT WAS ERROR FOR THE COURT TO DENY STEVENS'S MOTION FOR INDIVIDUAL SEQUESTERED *VOIR DIRE* OF JUROR PANELISTS?**

**IX. WHETHER AN IMPROPER COMMENT BY THE PROSECUTOR SERVED TO INFLAME THE JURY?**

**X. WHETHER THE VERDICTS OF THE JURY WERE AGAINST THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE?**

**XI. WHETHER IT WAS ERROR TO LIMIT STEVENS' VOIR DIRE?**

**XII. WHETHER IT WAS ERROR FOR THE COURT TO ALLOW PREJUDICIAL HEARSAY TESTIMONY?**

**XIII. IS THE IMPOSITION OF THE DEATH PENALTY EXCESSIVE OR DISPROPORTIONATE IN THIS CASE?**

## LEGAL ANALYSIS

**I. WHETHER IT WAS ERROR FOR THE COURT TO DENY BENNY JOE STEVENS'S MOTION FOR SEVERANCE OF THE MULTIPLE COUNTS IN THE INDICTMENT?**

¶39. Stevens appealed his conviction for four counts of capital murder of the following, Wesley, Glenda, Heath and Dylan, and one count of aggravated assault against Erica, alleging that the multiple-count indictment should have been severed.

¶40. On April 6, 1999, Stevens filed his Motion for Severance of the Multiple Count Indictment. Stevens alleged in his motion that the State should be required to prove each of the four homicide cases in a separate hearing before a separate jury. At the Omnibus Hearing on April 6, 1999, the trial court heard

Stevens's Motion for Severance. The State argued that under res gestae in order to tell the complete story, everything that happened at the crime scene is admissible before the jury. The trial court agreed with the State, even stating that multiple trials would give the State multiple chances at a conviction and cost a lot of money to have separate trials. Stevens's Motion for Severance was overruled by the trial court.

¶41. Historically, this Court had not allowed multi-count indictments until 1986 when the Mississippi Legislature adopted a multi-count statute. *Corley v. State*, 584 So.2d 769, 772 (Miss. 1991). However, the Mississippi Legislature adopted Miss. Code Ann. § 99-7-2 (2000), addressing whether two or more offenses may be tried together or must be severed.

¶42. Miss. Code Ann. § 99-7-2 (2000) reads in pertinent parts, as follows:

(1) Two (2) or more offenses which are triable in the same court may be charged in the same indictment with a separate count for each offense if: (a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan;

(2) Where (2) or more offenses are properly charged in separate counts of a single indictment, all such charges may be tried in a single proceeding;

(3) When a defendant is convicted of two (2) or more offenses charged in separate counts of an indictment, the court shall impose separate sentences for each conviction ....

¶43. This Court has stated that when a multi-count indictment has been handed down and the defendant has requested severance of the indictments the trial court should conduct a hearing on the issue. *Eakes v. State*, 665 So.2d 852, 861 (Miss. 1995). In *Eakes*, this Court set out the trial court's determination of whether a multi-count indictment warrants severance. The State bears the burden of proving that a multi-count indictment is within the language of the statute. *Id*. The trial court "should consider the time period between the offenses, whether evidence proving each offense would be admissible to prove the other counts, and whether the offenses are interwoven." *Id*.

¶44. This Court, in *Eakes*, restated the three options in which two or more offenses are triable in the same count and may be charged in the same indictment as addressed in Miss. Code Ann. § 99-7-2 (2000). *Id*. The three options are as follows:

(1) the offenses are based on the same act or transaction; or

(2) the offenses are based on two (2) or more acts or transactions connected together; or

(3) the offenses are based on two (2) or more acts or transactions constituting parts of a common scheme or plan.

*Id*. *See McCarty v. State*, 554 So.2d 909, 914 (Miss. 1989). The intervening time period must be insignificant as a prerequisite to both the second or third options. *Eakes v. State*, 665 So.2d at 861. This Court in *Corley*, stated that "[I]n allowing a multi-count indictment, this Court agreed with the Legislature that the offenses must be based on the same act or transaction, or be based on two or more acts or transactions, connected together or constituting parts of a common scheme or plan." *Corley v. State*, 584 So.2d at 772; *see McCarty v. State*, 554 So.2d at 914-16. Capital murder may be charged in a multi-

count indictment. ***Woodard v. State***, 533 So.2d 418, 421-23 (Miss. 1988), *vacated in part on other grounds*, ***Woodard v. State***, 635 So.2d 805 (Miss. 1993).

¶45. In the case sub judice, it is clearly evident that the four murders of Wesley, Glenda, Heath and Dylan, as well as the assault of Erica, all occurred on October 18, 1998, at the trailer occupied by Wesley, Glenda, Dylan and Erica. The murders and the assault occurred one after the other in a series of events arising out of the same acts or transactions which constituted a common scheme or plan to murder everyone inside that trailer on October 18, 1998. There existed no gaps in time between the crimes.

¶46. We find that the lower court did not err in allowing the four counts of capital murders being tried together under a multi-count indictment. The crimes undisputably constituted a common scheme or plan. This issue is wholly without merit.

### II. WHETHER IT WAS ERROR FOR THE COURT TO PROCEED UNDER THE INDICTMENT WHICH CONSTITUTED A VIOLATION OF THE DOUBLE JEOPARDY DOCTRINE AND THE "VAGUENESS DOCTRINE"?

¶47. In the case sub judice, Stevens was charged with four counts of capital murder and one count of aggravated assault. The State sought the death penalty against Stevens.

¶48. To charge Stevens with capital murder, the State relied on the underlying felonies of burglary and felony child abuse with the murders to elevate the murders to capital status.

¶49. Miss. Code Ann. § 97-3-19(2) (2000) provides the list of situations in which the killing of a human being without the authority of law shall be capital murder as follows:

(a) Murder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman. For purposes of this paragraph, the term "peace officer" means any state or federal law enforcement officer including but not limited to a federal park ranger, the sheriff of or police officer of a city or town, a conservation officer, a parole officer, a judge, prosecuting attorney or any other court official, an agent of the Alcoholic Beverage Control Division of the State Tax Commission, an agent of the Bureau of Narcotics, personnel of the Mississippi Highway Patrol, and the employees of the Department of Corrections pursuant to Section 47-5-54, and the superintendent and his deputies, guards, officers and other employees of the Mississippi State Penitentiary;

(b) Murder which is perpetrated by a person who is under sentence of life imprisonment;

(c) Murder which is perpetrated by use or detonation of a bomb or explosive device;

(d) Murder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals;

(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnaping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies;

(f) When done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony;

(g) Murder which is perpetrated on educational property as defined in Section 97-37-17;

(h) Murder which is perpetrated by the killing of any elected official of a county, municipal, state or federal government with knowledge that the victim was such public official.

Cited in Miss. Code Ann. § 97-3-19 (2)(f) (2000) to demonstrate instances that justify the commission of felonious child abuse and/or battery of a child states, Miss. Code Ann. § 97-5-39 (2)(2000) states:

Any person who shall intentionally (a) burn any child, (b) torture any child or, (c) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child and, upon conviction, may be punished by imprisonment in the penitentiary for not more than twenty (20) years.

¶50. Stevens argues that where the felony child abuse was the killing of a child, the murder of the child subsumes the felony child abuse. Stevens argues, therefore, the child abuse resulting in the deaths of Dylan and Heath should merge into their murders thereby not allowing their murders to be elevated to capital murder. This Court has previously rejected such a claim. *Faraja v. State*, 514 So.2d 295, 302-03 (Miss. 1987). In *Faraja*, this Court addressed the factually similar situation where the defendant argued that Miss. Code Ann. § 97-3-19(2)(f) was void because the merger doctrine applied. *Id*. The merger doctrine applies when the "underlying felony is 'merged' with the killing and cannot be treated as a separate crime." *Id*.

¶51. In *Faraja*, the defendant contended that since the facts demonstrated that only one act caused the death of the child, namely throwing a baby onto the pavement, then no one independent act constituted felonious abuse and/or battery of a child. *Id*. This Court stated that Miss. Code Ann. § 97-5-39(2) "does not require that the abuse be dispensed over a period of time before a charge for felonious abuse will arise."*Id*. This Court further stated that "[t]he intent of the Legislature was that serious child abusers would be guilty of capital murder if the child died." *Id.* at 302. We find that it was the intent of the Mississippi Legislature under Miss. Code Ann. § 97-5-39(2) that the intentional act of murdering a child by any manner or form constitutes felonious child abuse and, therefore, consitutes capital murder under Miss. Code Ann. § 97-3-19(2). The murder of a child constitutes serious child abuse, and the murder may be elevated to capital murder under the reasoning in *Faraja*. This Court in *Faraja*, restated the Court's position that the "Legislature's prerogative is to define crimes and set out punishment for offenders, and this prerogative is given great latitude. *Id.*; *See Peterson v. State*, 268 So.2d 335, 337-38 (Miss. 1972).

¶52. There only needs to be one act alone in order to constitute abuse and/or battery. *Brown v. State*, 690 So.2d 276, 291 (Miss. 1996). *See also Ahmad v. State*, 603 So.2d 843, 847 (Miss. 1992); *Monk v. State*, 532 So.2d 592, 598-99 (Miss. 1988); *Houston v. State*, 531 So.2d 598, 606 (Miss. 1988).

¶53. In the case sub judice, besides the acts of felonious child abuse committed involving the murder of the children Dylan and Heath, Stevens also shot his daughter, Erica, in the back. Erica was left with permanent craters in her back, five pellets permanently lodged in her shoulder and the trauma of witnessing the massacre of her family.

¶54. Stevens similarly argues, without citing any authority, that allowing the underlying act of burglary to enhance the murders to capital status was vague and violates the doctrine against double jeopardy.

¶55. Burglary is defined in Miss. Code Ann. § 97-17-23 (2000) as follows:

> Every person who shall be convicted of breaking and entering the dwelling house or inner door of such dwelling house of another, whether armed with a deadly weapon or not, and whether there shall be at the time some human being in such dwelling house or not, with intent to commit some crime therein, shall be punished by imprisonment in the Penitentiary not less than three (3) years nor more than twenty-five (25) years.

¶56. The statute requires breaking and entering with the intent to commit some crime in order to constitute burglary. Miss. Code Ann. § 97-17-23. Stevens entered the trailer clearly with the intent to commit murder of the individuals that happened to be inside the trailer on October 18, 1998. Stevens shot Wesley and came inside the trailer shooting everyone else in the trailer. The crime of murder can be the underlying element required to establish the crime of burglary. **Smith v. State**, 499 So.2d 750, 753-54 (Miss. 1986). In **Smith**, this Court unquestionably rejected the argument made by Stevens by holding that the underlying felony of burglary did not merge into murder. **Id**. at 754.

¶57. This Court in **Smith** had the same factual situation as in the case sub judice. The crime of burglary was used to raise the murder to capital murder. **Id**. The crime of burglary stands intact to elevate the murder to capital murder. **Id**. This Court in **Smith**, stated, in rejecting the merger doctrine, as follows:

> We decline to adopt the merger doctrine and hold that under our felony-murder statute, the underlying felony does not merge into the murder. Our statutory provisions dealing with murder and the particular felony, in this case, burglary, are intended to protect different societal interests. When the appellant entered the home of [a person] with the intent to commit a crime therein, i.e., to kill [the victim], the burglary was complete and the subsequent killing of [the victim] elevated the crime of murder to that of capital murder. We find the appellant's argument unpersuasive.

**Id**.

¶58. Even though, clearly Stevens's intent to commit the murders satisfies the underlying element for the burglary, the felonious child abuse previously addressed would also act to serve as both the underlying element of burglary and the underlying crime to elevate the murders to capital murder status.

¶59. We find that Stevens's argument that there was no act that would constitute felonious child abuse and that the felonious child abuse and burglary merger into the crime of murder are totally without merit.

### III. WHETHER THE STATE ABUSED THE RIGHT OF PEREMPTORY CHALLENGE IN THIS CASE UNDER THE PRINCIPLES OF THE *BATSON* CASE?

¶60. Stevens contends that the trial court erred in finding that the State could exercise its peremptory challenges on two black members of the venire under **Batson v. Kentucky**, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Stevens further contends that the State violated the principles of non-discrimination in the exercise of its peremptory challenges. The record reflects that the State exercised a total of six peremptory challenges, two of which were for venire panel members, Ragsdale and Olive. Ultimately, eleven white jurors and one black juror were empaneled. In the case at hand, Stevens is of the white race,

as well as, all five of the victims in the case.

¶61. In *Batson*, the United States Supreme Court held that a peremptory challenge cannot be used to exclude venire-persons from jury service based on their race. A peremptory challenge based on race constitutes a violation of due process. *Batson v. Kentucky*, 476 U.S. at 98, 106 S.Ct. at 1723-24. Since the *Batson* ruling in 1986, the use of the rule has been extended to other circumstances. *See J. E. B. v. Alabama ex rel. T. B.*, 511 U.S. 127, 129, 114 S.Ct. 1419, 1422, 128, L.Ed.2d 89(1994) (*Batson* extended peremptory challenges based on gender); *Georgia v. McCollum*, 505 U.S. 42, 54, 112 S.Ct. 2348, 2356, 120 L.Ed.2d 33 (1992) (defendant's use of peremptory challenges based on racial consideration was prohibited); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628-29, 111 S.Ct. 2077, 2087, 114 L.Ed.2d 660 (1991) (*Batson* extended to civil cases); *Powers v. Ohio*, 499 U.S. 400, 415-16, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991) (race-based challenges by the State without regard to the race of the defendant was prohibited); *Thorson v. State*, 721 So.2d 590, 594 (Miss. 1998) (*Batson* extended to peremptory strikes based on religion).

¶62. The necessary steps to resolve a peremptory challenge based upon *Batson* are cited in *Stewart v. State*, 662 So.2d 552, 557-58 (Miss. 1995) as follows:

> 1. The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge.

> 2. If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror.

> 3. The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of peremptory challenges.

¶63. The United States Supreme Court in *Georgia v. McCollum*, extended *Batson* and held that "the constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. Accordingly, if the State demonstrates a *prima facie* case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges." *Georgia v. McCollum*, 505 U.S. at 59, 112 S.Ct. at 2348. Ordinarily, the first step in analyzing the peremptory challenge is to determine "whether there was a *prima facie* showing that race was the motivation for the State's peremptory challenges." *Woodward v. State*, 726 So.2d 524, 530 (Miss. 1997).

¶64. However, in the case sub judice, the State gave its reasons for exercising its peremptory challenges without being required to do so or without the trial court first determining whether a prima facie case exists. When the State gives its reasons for exercising peremptory challenges without being required to do so or because the trial court orders it without finding a prima facie case, the requirement of making a prima facie is moot. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395(1991); *Manning v. State*, 735 So.2d 323, 338-41 (Miss. 1999); *Hughes v. State*, 735 So.2d 238, 250 (Miss. 1999); *Manning v. State*, 726 So.2d 1152, 1182-83 (Miss. 1998); *Woodward v. State*, 726 So.2d at 530.

¶65. In *Woodward,* this Court stated the "next step is to determine whether the prosecution met its burden of showing sufficient race-neutral explanations for its strikes." *Woodward*, 725 So.2d at 529-30. "A

peremptory challenge does not have to be supported by the same degree of justification required for a challenge for cause." *Stewart v. State*, 662 So.2d at 558. It is not necessary to meet the same standard of examination as a challenge for cause for a peremptory challenges. *Id*.

¶66. The State contended that juror Radgale was sleeping during voir dire and juror Ragdale was not still a registered voter in Madison county, having listed a Jackson address on the juror questionnaire. The trial court in responding to the State's challenge for cause and Steven's objection disallowed the challenge for cause as to juror Ragdale. The trial court, however, allowed the State to exercise its peremptory challenge as to juror Ragdale if it chose to do so. The trial court stated as follows:

> Anyway, even if it were, I would say that the fact that they [State] thought he [Ragdale] had been sleeping [during voir dire] and that he [Ragdale] was from a different county, residing in a different county, that would be a sufficient reason to excuse him [Ragdale]. But it will be S-2 [peremptory challenge] rather than for cause.

¶67. We hold that the fact that juror Ragdale no longer resided in Madison County to be a valid race neutral reason to allow the trial court to grant the State's peremptory strike of juror Ragdale. Residency is not a characterization based on race. In order to be qualified as a competent juror, residency in the county is required. Miss. Code Ann. § 13-5-1 (1972) states in pertinent part as follows:

> Every citizen not under the age of twenty-one years, who is either a qualified elector, or a resident freeholder of the county for more than one year, is able to read and write, and has not been convicted of an infamous crime, or the unlawful sale of intoxicating liquors within a period of five years and who is not a common gambler or habitual drunkard, is a competent juror.

¶68. The State also moved to strike juror Olive, a black female. The trial court allowed the strike as a peremptory challenge. Stevens's attorney objected. The State stated that juror Olive did not complete the juror questionnaire, follow the court's directions and appeared to be inattentive and preoccupied the whole time. The State's position was that the State only had to provide a racially neutral reason for the peremptory challenge, not a racial neutral reason giving rise to a challenge for cause.

¶69. The trial court inquired from the State if it planned to strike juror Bouldin, the next black juror on the venire panel. The State responded that it planned to accept juror Bouldin. On that understanding, the trial court allowed juror Olive to be struck over Stevens's objection.

¶70. It may be argued that one or all of the race-neutral reasons expressed by the defense are acceptable. However, it must be remembered that this Court has held that the trial judge is afforded great deference in determining if the expressed reasons for exclusion of a venire-person from the challenged party is in fact race-neutral. *Tanner v. State*, 764 So.2d 385, 393 (Miss. 2000). In *Stewart*, this Court held that "one of the reasons the trial court is granted such deference in a *Batson* issue is because the demeanor of the attorney making the challenge is often the best evidence on the issue of race neutrality." *Stewart*, 662 So.2d at 559. Furthermore, the determination of discriminatory intent will likely turn on a trial judge's evaluation of a presenter's credibility and whether an explanation should be believed. *Hernandez v. New York*, 500 U.S. at 359, 365, 111 S.Ct. at 1866. In *Stewart* this Court, also, held that "[d]espite the importance of demeanor evidence, the trial court must consider all the relevant circumstances, such as the way prior peremptory strikes have been used and the nature of the questions poised on voir dire." *Stewart*, 662 So.2d at 559 (citing *Griffin v. State*, 607 So.2d 1197, 1202 (Miss. 1992)). A reversal will only occur if

the factual findings of the trial judge appear to be "clearly erroneous or against the overwhelming weight of the evidence." ***Tanner***, 764 So.2d at 393 (citing ***Stewart v. State***, 662 So.2d at 558); ***Davis v. State***, 551 So.2d 165, 171 (Miss. 1989).

¶71. The trial judge witnessed the challenges in court and could observe the demeanor of all involved as well as all other relevant circumstances in the case. We find that the trial court's findings are not clearly erroneous or against the overwhelming weight of the evidence. Therefore this contention is without merit.

### IV. WHETHER THE COURT VIOLATED THE HUSBAND AND WIFE PRIVILEGE?

¶72. Stevens argues that the State should not been allowed to call his wife, Lauren, as a witness. Stevens's position was that the testimony was barred by spousal privilege, and Stevens objected at trial. The trial court allowed Lauren to testify at trial.

¶73. Lauren's testimony in question that Stevens primarily objects to on appeal are the following statements made by Stevens to his wife: (1) "I just killed a family" and (2) "I hid the gun in the trees."

¶74. The State presented a two-fold argument to the trial court that the testimony should be allowed: (1) because the acts involved a crime against or abuse to a child and (2) some of the statements made by Stevens [that he had just killed a family] were made in the presence of a third party, his brother, Ricky.

¶75. We find that Stevens erroneously relies on Miss. Code Ann. § 13-1-5 (Supp. 2001). Stevens argues that Miss. Code Ann. § 13-1-5 provides that the wife is not a competent witness against her husband when the husband is on trial for criminal acts against a child who is not her child or a member of her household. That is a misstatement of the Code section.

¶76. Miss. Code Ann. § 13-1-5 (Supp. 2001) provides:

> Husbands and wives may be introduced by each other as witnesses in all cases, civil or criminal, and shall be competent witnesses in their own behalf, as against each other, in all controversies between them. Either spouse is a competent witness and may be compelled to testify against the other in any criminal prosecution of either husband or wife for a criminal act <u>against a child</u>, for contributing to the neglect or delinquency of a child, or desertion or nonsupport of children under the age of sixteen (16) years, or abandonment of children. But in all other instances where either of them is a party litigant the other shall not be competent as a witness and shall not be required to answer interrogatories or to make discovery of any matters involved in any such other instances without the consent of both.

(emphasis added). Thus, Section 13-1-5 allows either spouse to testify against the other in a criminal prosecution for a criminal act committed against any child.

¶77. Rule 601 of M.R.E. addresses the competency of witnesses to testify. The comments to Rule 601 of M.R.E. provides in pertinent part:

> As originally written, Rule 601 excepted two classes from competency, spouses pursuant to MCA § 13-1-5 and persons convicted of perjury or subornation of perjury pursuant to MCA § 13-1-11. Rule 601 was subsequently amended in 1990 to delete statutory references. Subsection (a) retains the substance of superseded M.C.A. § 13-1-5.

Rule 601 (a)(1) and (a)(2) provide exceptions where one spouse shall be a competent witness against the other spouse. Rule 601 (a)(1) and (2) of M.R.E. provide:

(a) In all instances where one spouse is a party litigant the other spouse shall not be competent as a witness without the consent of both, except as provided in Rule 601 (a)(1) or Rule 601 (a)(2):

(1) Husbands and wives may be introduced by each other in all cases, civil or criminal, and shall be competent witnesses in their own behalf, as against each other, in all controversies between them;

(2) Either spouse is a competent witness and may be compelled to testify against the other in any criminal prosecution of either husband or wife for a criminal act against any child, for contributing to the neglect or delinquency of a child, or desertion or nonsupport of children under the age of sixteen (16) years, or abandonment or children.

¶78. The record reflects that not only did Erica suffer child abuse resulting from the gunshot and permanent injuries sustained, but also two children, Dylan and Heath, were brutally murdered on the killing rampage. Pursuant to Rule 601 (a)(2), obviously, Lauren was a competent witness to testify.

¶79. Stevens also argues that Rule 504 of M.R.E. prevents the testimony due to the husband-wife privilege. Stevens presents the position that since the children, Dylan and Heath, were not Lauren's children nor were they residents of her household, then Rule 504 of M.R.E. does not provide an exception to the marital privilege. We find that this argument is not supported by M.R.E. 504. The husband-wife privilege under M.R.E. 504 provides:

(a) A communication is confidential if it is made privately by any person to his or her spouse and is not intended for disclosure to any other person.

(b) In any proceeding, civil or criminal, a person has a privilege to prevent his spouse, or former spouse, from testifying as to any confidential communication between himself and his spouse.

(c) The privilege may be claimed by either spouse in his or her own right or on behalf of the other.

(d) There is no privilege under this rule in a proceeding in which one spouse is charged with a crime against (1) the person of any minor child or (2) the person or property of (i) the other spouse, (ii) a person residing in the household of either spouse, or (iii) a third person committed in the course of committing a crime against any of the persons described in (d)(1) or (2) of this Rule.

¶80. First, there was testimony from Lauren that at the time Stevens confessed to her that he had just killed a family, Stevens's brother, Ricky, was also on the porch and heard Stevens's statement. Lauren testified that she remembered Ricky gasp for breath in shock. The marital privilege only applies to confidential communications. M.R.E. 504 (a). Communication will be deemed to be non-confidential if it is made in the presence of another person, even if that person is a family member. *Shell v. State*, 554 So.2d 887, 894-95 (Miss. 1989), *reversed in part on other grounds*, *Shell v. Mississippi*, 498 U.S.1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990)); *Fanning v. State*, 497 So.2d 70, 74 (Miss. 1986); *Dycus v. State*, 440 So.2d 246, 256 (Miss. 1983).

¶81. Secondly, without restating the evidence and prior argument discussed, the record reflects that there were multiple counts of felonious child abuse involved in the commission of the crime. Rule 504 (d)(1)

states that there is no marital privilege when one spouse is charged with a crime against the person of any minor child or any third person while involved in committing a crime against a minor child.

¶82. We find that the wife's testimony is clearly admissible as not being privileged as provided in the exceptions to the marital privilege in Rule 504(d) of M.R.E. Stevens was charged with the capital murder of two minor children, Dylan and Heath, as well as, the aggravated assault of a third child, Erica. Rule 504 of M.R.E. does not limit the exception to where a crime must be committed against a minor child of the testifying spouse or that spouse's household. Rule 504 (d)(1) of M.R.E. provides an exception when one spouse is charged with a crime against any minor child.

¶83. These assignments of error are wholly without merit. We find that the trial court properly allowed Lauren to testify against Stevens.

### V. WHETHER IT WAS ERROR FOR THE COURT TO DENY THE TESTIMONY OF THE DEFENSE EXPERT IN THE GUILT PHASE OF THE TRIAL ON THE ISSUE OF DEFENDANT'S ABILITY TO FORM SPECIFIC INTENT?

¶84. Stevens argues that the trial court erred in excluding Stevens's expert, Dr. Sarah Deland, a forensic psychiatrist, from testifying at trial during the guilt phase. Stevens did not present insanity as a defense at trial. Stevens argued that Dr. Deland was to testify regarding his diminished capacity to form specific intent. The State's position at trial was that the only mental defense in Mississippi is insanity under *M'Naghten*. The trial court ruled that during the guilt phase that unless the expert testimony can establish a *M'Naghten* issue, the expert, Dr. Deland, would not be allowed to testify at the guilt phase of the trial. The trial court allowed Stevens to make a proffer of Dr. Deland's testimony stating "[u]nless there's an issue of insanity, then she [Dr. Deland] could testify about that if that's a defense. But just for anything else, she would not be allowed to testify." The trial court stated that otherwise, Dr. Deland's testimony would be acceptable in a sentencing phase as mitigation. Dr. Deland's proffered testimony was that in her opinion within a reasonable degree of medical certainty that Stevens lacked the ability to form specific intent to commit the charges levied against him. Dr. Deland cited Stevens's major depression, head injury (post-cussional syndrome), alcohol abuse, alcohol intoxication, xanax abuse, xanax intoxication, and learning disability as factors used in her conclusion. Dr. Deland stated that she reached her conclusion by reviewing the information, data or testing provided through interviews with family members; interview with Stevens; statements given to the police by Ricky Stevens, Erica Stevens and Lauren Stevens; Stevens's school records; investigative materials furnished by Stevens's attorney, Mr. Sweatt; pharmacy records, and medical records from various places; results of neuropsychological testing by Dr. Zimmerman; the indictment; the police reports; the autopsy reports and photographs.

¶85. After reviewing the proffered testimony, the trial court stated that it would allow Dr. Deland to testify at the sentencing phase, if the case reached the point of sentencing.

¶86. In Mississippi, the *M'Naghten* test is used to determine legal insanity. *Cannaday v. State*, 455 So.2d 713, 720 (Miss. 1984); *Westbrook v. State*, 658 So.2d 847, 850 (Miss. 1995); *Roundtree v. State*, 568 So.2d 1173, 1181 (Miss. 1990); *Tyler v. State*, 618 So.2d 1306, 1309 (Miss. 1993); *Davis v. State*, 551 So.2d 165, 173 (Miss. 1989). This Court in *Harvey v. State*, 207 So.2d 108, 118 (Miss. 1968), stated that it "will continue to adhere to the *M'Naghten* rule as a test of criminal responsibility by reason of insanity." The function of the *M'Naghten* test for insanity is to determine if the defendant was unable to distinguish right from wrong when the criminal act in question was committed. *Roundtree*, 568

So.2d at 1181. In order to establish a defense on the ground of insanity, it must be clearly proved that at the time the act was committed, "the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it, that he did not know that what he was doing was wrong." *Id*. *See Laney v. State*, 486 So.2d 1242, 1245 (Miss. 1986). The jury is left to decide the issue of insanity. *Yarbrough v. State*, 528 So.2d 1130 (Miss. 1988); *Gerlach v. State*, 466 So.2d 75, 79 (Miss. 1985); *Hunter v. State*, 489 So.2d 1086, 1090 (Miss. 1986); *Gill v. State*, 488 So.2d 801, 802 (Miss. 1986); *Frost v. State*, 453 So.2d 695, 698 (Miss. 1984). In *Laney*, this Court stated that even though in the record it is uncontradicted that "Laney suffers from the mental disorder, schizophrenia, paranoia type," that "does not in itself make him *M'Naughten* insane."*Laney*, 486 So.2d at 1245.

¶87. In *Cannaday*, the defendant tried to assert a diminished capacity defense. *Cannaday*, 455 So.2d at 720. The defense sought to introduce expert psychiatric testimony showing her limited mental ability. *Id*. Defense posed two questions (1) about marijuana use and (2) about her crying and being upset. *Id*. This Court held that the trial court properly did not allow the defense of diminished capacity to rise to met the *M'Naughten* test according to the experts at trial. *Id*. Diminished capacity is not a defense to a criminal charge in this State. *Id.*; *See also Edwards v. State*, 441 So.2d 84, 88 (Miss. 1983); *Hill v. State*, 339 So.2d 1382, 1385 (Miss. 1976); *Laney v. State*, 421 So.2d at 1219 (Miss. 1982).

¶88. We find that the trial court properly did not introduce evidence to establish a defense of diminished capacity that does not stand up to the *M'Naughten* test for legal insanity during the guilt phase. In the case sub judice, Stevens never argued that he was not sane. In fact, Stevens' attorney admitted that Stevens was not insane under *M'Naghten*. No evidence was presented to the trial court that Stevens satisfied the *M'Naghten* test for legal insanity to constitute a defense.

¶89. The trial court, however, properly allowed Dr. Deland to testify as to Stevens's diminished capacity on the sentencing phase to provide mitigation. Miss. Code Ann. § 99-19-101 (1) (2000) states in pertinent part that: "[I]n the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall not include matters relating to any of the aggravating or mitigating circumstances."

¶90. Furthermore, the special concurring opinion in *McDaniel* established the principle that voluntary intoxication is not a defense to specific intent crimes. *McDaniel v. State*, 356 So.2d 1151, 1156, 1161 (Miss. 1978). This principle is known as the *McDaniel* rule. *Smith v. State*, 445 So.2d 227, 231 (Miss. 1984). The *McDaniel* rule is simply and clearly defined in *Smith* as follows:

> [I]f a person, when sober, is capable of distinguishing between right and wrong and voluntarily intoxicates or drugs himself to the extent that he does not know or understand his actions, e.g., steals, robs, or murders, he is responsible and he maybe convicted and sentenced for the crime.

*Id*.

¶91. We hold that since Stevens does not allege that he lacked the ability to differentiate between right and wrong, the fact that he had been abusing alcohol, pain and anti-depressant medication should not have been presented to the jury to show that he lacked the ability to formulate specific intent on the guilt phase at trial. This issue is without merit.

## VI. WHETHER THE CAPITAL PUNISHMENT SCHEME IS UNCONSTITUTIONAL?

¶92. Stevens argues that Mississippi's capital punishment statute violates the Eighth and Fourteenth Amendments and is therefore unconstitutional. Miss. Code Ann. § 99-19-101(1) (2000) addresses the jury's determination of whether to impose the death penalty sentence after a conviction or adjudication of guilt and provides as follows:

> Upon conviction or adjudication of guilt of a defendant for capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial judge is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of imposition of the penalty. If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing. In the proceeding, evidence may be represented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitutions of the United States or of the State of Mississippi. The state and the defendant and/or his counsel shall be permitted to present arguments for or against sentence of death.

(emphasis added). This Court has repeatedly held that "Mississippi's capital sentencing scheme, as a whole, is constitutional." *Woodward v. State*, 726 So.2d at 528. *See Lockett v. State*, 614 So.2d 888, 897 (Miss. 1992); *Coleman v. State*, 378 So.2d 640, 647 (Miss. 1979); *Washington v. State*, 361 So.2d 61, 65 (Miss. 1978).

¶93. In support of his position that the death penalty is unconstitutional, Stevens cites the United States Supreme Court case *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct.1676, 95 L.Ed.2d 127 (1987). The Court in *Tison* held that a defendant must "knowingly engage in criminal activities known to carry a grave risk of death." *Tison v. Arizona*, 481 U.S. at 157-58, 107 S.Ct. at 1687-88. However, *Tison* addressed an Arizona statute which allowed capital punishment for reckless disregard for life. *Id*.

¶94. This is not the situation in the case sub judice. First, reckless disregard for human life is not an aspect of Mississippi's capital sentencing scheme. *See* Miss. Code Ann. § 97-3-19 (2000). Second, as previously discussed, Stevens did not present any admissible evidence that he did not intend to murder Wesley, Glenda, Dylan and Heath or shoot Erica. No expert provided testimony that Stevens was not aware of what he was doing at the time the crimes were committed.

¶95. Two forensic psychiatrists testified on sentencing, Dr. Sarah Deland and Dr. Henry Maggio. Dr. Sarah Deland testified on mitigation for Stevens. She stated that Stevens was aware of what he was doing at the time the crimes were committed. Dr. Deland did not address whether or not Stevens knew right from wrong as previously discussed under the *M'Naghten* argument. Dr. Henry Maggio testified that, in his medical opinion within a reasonable degree of medical certainty, Stevens was not confused and knew exactly what he was doing at the time the crimes were committed. Dr. Maggio testified that Stevens executed his plan and then carried out plans to conceal his action. Stevens went to the home of Wesley and Glenda Reed and shot five people, killing four with one escaping. Dr. Maggio testified that Stevens knew

right from wrong. Dr. Maggio took into account that Stevens took action to cover up his involvement with the crimes. Dr. Maggio further took into account that Stevens came home and told his wife, Lauren, that he had just killed a family.

¶96. Furthermore, Erica, the sole surviving victim, testified that Stevens said at the time he killed her mother, Glenda, "[B]itch, I told you that I'd kill you one of these days."

¶97. We hold that the evidence unquestionably supports the finding that Stevens intended to kill his victims, and he was aware of what he was doing at the time the crimes were committed.

¶98. In Mississippi, the capital punishment statute Miss. Code Ann. § 99-19-101 (7) (a)-(d) provides that in order to return and impose a sentence of death, the jury must make a written finding of one or more of the following factors:

> (a) The defendant actually killed;
>
> (b) The defendant attempted to kill;
>
> (c) The defendant intended that a killing take place;
>
> (d) The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101 (7) (a)-(d) (2000).

¶99. The State must only prove one of the four facts. It is not necessary that the State prove intent where the victim was actually killed. *Lockett v. State*, 517 So.2d 1317, 1338 (Miss. 1987); *Jordan v. State*, 464 So.2d 475, 479-80 (Miss. 1985); *Williams v. State*, 445 So.2d 798, 807 (Miss. 1984). Miss. Code Ann. § 99-19-101 (7) only requires that one of the factors be found to support a death sentence. *Smith v. State*, 729 So.2d 1191, 1218-19 (Miss. 1998); *Bell v. State*, 725 So.2d 836, 860-61 (Miss. 1998).

¶100. We find that Stevens's argument regarding the unconstitutionality of Mississippi's capital sentencing scheme is wholly without merit.

### VII. WHETHER IT WAS ERROR FOR THE COURT TO DENY STEVENS'S MOTION TO DELAY THE SENTENCING PHASE?

¶101. Stevens argues that the trial court erred by not delaying the sentencing phase of the trial. Stevens contends that he was entitled to a "cooling-off" period. Miss. Code Ann. § 99-19-101(1) states in pertinent part as follows:

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable.

¶102. We find that Stevens's argument is procedurally barred. After the jury returned the guilty verdicts at 11:25 a.m. on December 3, 1999, the trial court conducted a bench conference. Stevens's attorney requested that the court recess until 1:00 p.m. that afternoon in order to prepare to proceed with the

sentencing phase. The State agreed with the defense for a recess. The trial court granted the request and stated, "Okay. We'll just do that then. We'll just recess until one o'clock." Court was recessed at 11:32 a.m. and reconvened at 1:15 p.m.

¶103. Stevens did not request that the sentencing phase be recessed until later than 1:00 p.m. that day. Furthermore, when the trial court reconvened at 1:15 p.m., Stevens did not request a further continuance.

¶104. The trial court conducted a separate sentencing hearing as soon as practicable as required in Miss. Code Ann. § 99-19-101(1). We find that Stevens was granted the extension he requested. This issue is wholly without merit.

## VIII. WHETHER IT WAS ERROR FOR THE COURT TO DENY STEVENS'S MOTION FOR INDIVIDUAL SEQUESTERED *VOIR DIRE* OF JUROR PANELISTS?

¶105. Stevens argues that the trial court erroneously denied his motion for individual sequestered voir dire of the jury panelists. Stevens contends that jurors may remain silent during the voir dire process and fail to respond to questions for various reasons. Stevens contends that the jurors may not respond because they do not understand what is being asked due to ignorance or being misinformed or because the elicited responses may embarrass a juror on questions that inquire into the juror's feelings, attitudes, beliefs, memberships and relationships.

¶106. The trial court in the case sub judice allowed the jurors to approach the bench if they did not wish to answer a question in front of the venire panel. The trial court explained to the venire panel that if the jurors did not raise their hands when asked a question, then it will be assumed that the juror's answer is the one that was expected from the way the question was phrased.

¶107. The trial court also used a juror information questionnaire previously used by the trial court in a capital murder case. The questionnaire covered various topics including educational background, employment background, relationships, criminal background of family members or a close friend, religious affiliation, involvement in legal actions, prior jury service, organizational membership, television programs regularly viewed, marital status, hobbies, children's ages and occupations. The trial court's questionnaire covered some of the embarrassing questions normally posed to a jury panel on voir dire.

¶108. The record reflects that the trial court worked extensively with the attorneys to design the jury questionnaire. The trial court stated at the omnibus hearing held on April 6, 1999, that the questionnaires are used to "limit a lot of problems and a lot of questions." If an attorney ran into problems on voir dire, the trial court stated that it would allow smaller groups of jurors to be voir dired if necessary to address particular questions.

¶109. The procedure for conducting voir dire in criminal cases is governed by Rule 5.02 of the Uniform Criminal Rules of Circuit Court Practice. *Russell v. State*, 607 So.2d 1107, 1110 (Miss. 1992). The circuit court has discretion under URCCC, Rule 3.05 (formerly Unif. Crim. R. Cir. Ct. Pra., Rule 5.02), to allow individual sequestered voir dire. *Edwards v. State*, 737 So.2d 275, 307-08 (Miss. 1999); *Manning v. State*, 735 So.2d 323, 335-36 (Miss. 1999); *Berry v. State*, 703 So.2d 269, 291 (Miss. 1997); *Ballenger v. State*, 667 So.2d 1242, 1249-50 (Miss. 1995); *Simons v. State*, 688 So.2d 791, 798-801, 804-805 (Miss. 1997); *Carr v. State*, 655 So.2d 824, 842-43 (Miss. 1995); *Chase v. State*, 645 So.2d 829, 846 (Miss. 1994); *Russell v. State*, 607 So.2d 1107, 1110 (Miss. 1992); *Hansen v.*

*State*, 592 So.2d 114, 126 (Miss. 1991); *White v. State*, 532 So.2d 1207, 1218 (Miss. 1988); *West v. State*, 463 So.2d 1048, 1054 (Miss. 1985); *Billiot v. State*, 454 So.2d 455, 456 (Miss. 1984).

¶110. Uniform Rule of Circuit and County Court Practice 3.05 provides:

Rule 3.05 VOIR DIRE

In the voir dire examination of jurors, the attorney will question the entire venire only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge to a particular verdict will be asked. Attorneys will not offer an opinion on the law. The court may set a reasonable time limit for voir dire.

¶111. While the Court has stated that Rule 5.02 allows a circuit court, in its own discretion, to utilize individualized, sequestered voir dire, this Court further held that Rule 5.02 does not require more than what is stated on its face. *Russell v. State*, 607 So.2d at 1110; *Hansen v. State*, 592 So.2d at 126; *White v. State*, 532 So.2d at 1218; *West v. State*, 463 So.2d at 1054. In *Russell*, this Court stated that the "contention that he [Russell] should have been allowed to individually voir dire jurors out of the presence of the others is not supported by the decision of the Court." *Russell v. State*, 607 So.2d at 1110; *White v. State*, 532 So.2d at 1218.

¶112. We find that the decision of whether to allow individual sequestered jury voir dire should be left to the discretion of the trial court. The trial court in the case sub judice allowed juror questionnaires, open voir dire option of small group voir dire, as well as, allowed many jurors to approach the bench to answer the questions posed during voir dire. We determined that Stevens presents no harm or prejudice as a result of the way voir dire was conducted. This issue is wholly without merit.

### IX. WHETHER AN IMPROPER COMMENT BY THE PROSECUTOR SERVED TO INFLAME THE JURY?

¶113. Stevens contends that the case should be remanded for resentencing because of the State's comments made during opening statements on the sentencing phase. In specific, the State's opening statement in its entirety including the bench conferences is stated as follows:

**OPENING STATEMENT BY THE STATE**

**BY MR. BURDICK:** Ladies and gentlemen, you've seen me since Monday, and I've seen you. We've been together. I've tried to be honest with you from day one. I did the voir dire, if you remember, and I did not use the word "execution." I did not used the word "state-sanctioned execution." I did not use the phrase "put this man to death." I tried to be as honest as I could. And I tried to be honest throughout this trial the same way. But I told you at one point in this trial, if we got there, I would ask you to kill Benny Joe Stevens.

It's not time for levity. You're in a situation where you have a heavy load on your shoulders, and I know it. I've been at this for 30 years, and I've talked to jurors after trials like this. And they have wrenched, they have gut-wrenched, they have worried, they have sweated, and they've had ulcers. But they also had one thing in common. Regardless of their verdict, in their hearts they felt they did the right thing. And we're asking you to do the right thing. And that's your decision. I respected your

decision, whatever it is, on the penalty phase. I only ask you to look at a few things.

Now, there will be a closing argument in addition to an opening. The closing will be similar to the guilt, meaning Mr. Douglass and I will go first, they go in between, and we'll come back. And that perhaps will be more emotional than this.

But I've learned after all these years that holding up a lot of photographs or bloody picture, screaming, yelling works sometimes with certain juries, but I don't think you're that type of jury, or you wouldn't be here. We've studied your background, we've talked to you. We think you're very thorough, very intelligent, and you don't respond to a lot of screaming, yelling and bloody pictures.

But on the other hand, as you hear and listen to the evidence in this sentencing phase, I want you to keep one thing in mind. There's one word that has not been used in this courtroom in five days. And that's the word "slaughter." Unprovoked slaughter of an entire family.

There comes a time when certain acts -- and I thought I'd seen a lot in my 30 years - there comes a time when an act is committed that is so --

**MR. SWEATT:** Your Honor, we object to his commenting, using his experience to compare the case, severity of the case.

**MR. BURDICK:** Forget all my other cases. There comes a time when an act is committed that is so devoid of humanity, so merciless, so pitiless, that a jury is given an option of death. And ya'll have that option.

As you listen to the evidence, the State will first put on Erica Stevens, who you heard before. She will not describe the acts. That phase is over with. She will be put on for what is referred to as the victim impact on her life, on her family. What has this done to her? Then we will resubmit all the evidence that you've seen here back into the sentencing phase. Then the other side will put on whatever they want.

I tell you this. When these acts that are committed that are devoid of humanity, I don't care about a person's childhood. We had two little boys in this massacre who will not have a childhood. I'm simply asking that when you hear the evidence that you keep all this in mind. Thank you.

**THE COURT:** Mr. Sweatt.

**MR. SWEATT:** May we approach the bench Your Honor?

**THE COURT:** All right

**[BENCH CONFERENCE AS FOLLOWS]**

**MR. SWEATT:** We objected to what was like a comment on using his experience to say this is the worst case -

**MR. BURDICK:** I didn't say that.

**MR. SWEATT:** And the Court didn't rule.

**THE COURT:** I thought he changed it.

**MR. BURDICK:** I did. I said forget about all the experience.

**THE COURT:** That's what I thought he said.

**MR. SWEATT:** It's overruled.

**THE COURT:** Yeah.

**[BENCH CONFERENCE CONCLUDED]**

¶114. This Court has held that a trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect. *Roundtree v. State*, 568 So.2d 1173, 1178 (Miss. 1990). "The judge is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared."*Id*.

¶115. Applying the law to the facts in the case sub judice, we find that the trial court did not abuse its discretion by denying Stevens's objection. The trial court found that after the defense raised an objection the State rectified the statement.

¶116. Stevens also argues that the judge "gave no curative instruction." Stevens did not ask for any instruction or admonishment from the trial court. The prosecutor personally told the jury to disregard the comment by stating, "Forget all my other cases." There was nothing for the trial judge in the case sub judice to "cure" with an admonishing instruction. Furthermore, Stevens did not request a mistrial or sentencing before another jury. This Court has held that attorneys are allowed wide latitude in their arguments "limiting them not only to facts, but also to deductions and conclusions which may be drawn therefrom, and to the application of the law to those facts." *Holly v. State*, 716 So.2d 979, 988 (Miss. 1998).

¶117. The question for this Court on appeal is "whether the natural and probably effect of the improper argument of the prosecuting attorney [created] an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Wells v. State*, 698 So.2d 497, 507 (Miss. 1997). In *Wells*, this Court also dealt with the "golden rule" argument. *Id*. at 506. A golden rule argument asks the jurors to put themselves in the place of one of the parties. *Chisolm v. State*, 529 So.2d 635, 639-40 (Miss. 1988). In *Wells*, this Court did not find that the isolated golden rule argument resulted in any prejudice to the defendant. This Court stated, "[I]n light of the overwhelming evidence against Wells, the jury's verdict likely was not influenced by any prejudice that might have resulted from the district attorney's isolated "golden rule" argument." *Id*. at 507.

¶118. In the case sub judice, the statement made by the State was on the opening statement of the sentencing phase after the same jurors have returned the guilty verdicts. As in *Wells*, the overwhelming evidence presented to the jury does not render the likelihood that any prejudice was committed. Upon the defense's objection, the State rephrased the statement without the necessity of the trial court's ruling.

¶119. Similar statements by prosecutors of personal opinions have been upheld by this Court. *See Evans v. State*, 725 So.2d 613, 670-73 (Miss. 1997); *Holland v. State*, 705 So.2d 307, 347 (Miss. 1997). *See also Johnson v. State*, 416 So.2d 383, 391 (Miss. 1982)(a prosecutor "may explore all the shores of thought and experience" and "draw upon literature, history, science, religion and philosophy for material").

¶120. In *Monk v. State*, 532 So.2d 592, 601 (Miss. 1988), this Court stated:

The right to argument contemplates liberal freedom of speech and range of discussion confined only to bounds of logic and reason; and if counsel's argument is within limits of proper debate, it is immaterial whether it is sound or unsound or whether he employs wit, invective, and illustration therein. Moreover, figurative speech is legitimate if there is evidence on which it may be founded. Exaggerated statements and hasty observations are often made in the heat of the day, which, although not legitimate, are generally disregarded by the court, because in its opinion, they are harmless. There are, however, certain well established limits beyond which counsel is forbidden to go. He must confine himself to the facts introduced in evidence and to the fair and reasonable deduction and conclusions to be drawn therefrom and to the application of the law, as given by the court, to the facts.

¶121. Absent impermissible factors such as commenting on the failure of the defendant to testify, a prosecuting attorney is entitled to great latitude in closing argument. We find this issue to be without merit.

## X. WHETHER THE VERDICTS OF THE JURY WERE AGAINST THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE?

¶122. Stevens contends that the legal sufficiency of the evidence does not support the guilty jury verdict of capital murder and that the trial court abused its discretion in denying post-trial motions for a new trial or in the alternative JNOV. We find that the assertions are without merit. Both of Stevens's contentions of legal sufficiency and weight of the evidence will be fully addressed.

¶123. As to legal sufficiency, this Court held in *Pinkney v. State*, 538 So.2d 329, 353 (Miss. 1988), that reversal can only occur when evidence of one or more of the elements of the charged offense is such that "reasonable and fair minded jurors could only find the accused not guilty."

¶124. As to the weight of the evidence, this Court held in *McFee v. State*, 511 So.2d 130, 133-34 (Miss. 1987), that it has limited authority to interfere with a jury verdict. The Court looks at all the evidence in the light that is most consistent to the jury verdict. *Id*. The prosecution is given "the benefit of all favorable inferences that may reasonable be drawn from the evidence." *Id*. "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Herring v. State*, 691 So.2d 948, 957 (Miss. 1997) (citing *Thornhill v. State*, 561 So.2d 1025, 1030 (Miss. 1989)). This Court must accept as true the evidence favorable to the State. *Wetz v. State*, 503 So.2d at 812; *see Van Buren v. State*, 498 So.2d 1224, 1228 (Miss. 1986).

¶125. Stevens argues that the evidence in the case was insufficient to support the sentence instruction number six which addressed the heinous, atrocious or cruel aggravation. The sentencing instruction as given by the trial court is as follows:

SENTENCING INSTRUCTION NO. 6

The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders - the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance exists.

¶126. In death penalty cases, Miss. Code Ann. § 99-19-101(5) limits the aggravated circumstances presented in jury determination of death penalty. Miss. Code Ann. § 99-19-101(5) provides as follows:

(5) Aggravating circumstances shall be limited to the following:

(a) The capital offense was committed by a person under sentence of imprisonment.

(b) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.

(c) The defendant knowingly created a great risk of death to many persons.

(d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnaping, aircraft piracy, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, Mississippi Code of 1972, or the unlawful use or detonation of a bomb or explosive device.

(e) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(f) The capital offense was committed for pecuniary gain.

(g) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(h) The capital offense was especially heinous, atrocious or cruel.

Miss. Code Ann. § 99-19-101(5)(h) provides for aggravating circumstance to be presented where, "the capital offense was especially heinous, atrocious or cruel." This Court has repeatedly approved the following defining instruction, with regard to this aggravating circumstance in Miss. Code Ann. § 99-19-101(5)(h):

The court instructs the jury that considering whether the capital offense was especially heinous, atrocious or cruel, heinous means outrageously wicked and shockingly; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to or even enjoyment of the suffering of others.

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders-the conscienceless or pitiless crime which is

unnecessarily torturous to the victim.

> If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, or that there was dismemberment of the body prior to death, or that the defendant inflicted physical or mental pain before death, or that there was mental torture or aggravation before death, or that a lingering or torturous death was suffered by the victim then you may find this aggravating circumstance.

*Crawford v. State*, 716 So.2d 1028, 1047 (Miss. 1998). "This Court has repeatedly held that this exact narrowing instruction on the 'heinous, atrocious and cruel' aggravator satisfies constitution requirements." *Id*. *Lester v. State*, 692 So.2d 755, 797-98 (Miss. 1997); *Jackson v. State*, 684 So.2d 1213, 1236-37 (Miss. 1996); *Carr v. State*, 655 So.2d at 851-52; *Conner v. State*, 632 So.2d 1239, 1269-71 (Miss. 1993); *Jenkins v. State*, 607 So.2d 1171, 1181-82 (Miss. 1992)). The jury instruction given in the case sub judice closely follows the language given by this Court in *Crawford*.

¶127. This Court has repeatedly held that the "especially heinous, atrocious or cruel" provision of Miss. Code Ann. § 99-19-101 (5)(h) is not so vague and overbroad as to violate the United States Constitution. *Mhoon v. State*, 464 So.2d 77, 84 (Miss. 1985). *See Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

¶128. "The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background and his crime." *Clemons v. Mississippi*, 494 U.S. 738, 748, 110 S.Ct. 1441, 1448, 108 L.Ed.2d 725 (1989).

¶129. We find that there is ample evidence presented to establish that the crimes committed by Stevens fit squarely within the limiting definition of heinous, atrocious and cruel provided in the jury instruction given by the trial court. Wesley was shot four times with two different guns. Wesley called out for help and asking God for help. Glenda pleaded for her children's safety before being shot in the head. Two young boys, Heath and Dylan, were both brutally murdered. Heath, age twelve, was shot twice, the first shot to the face with the second fatal shot to the chest severing his spine. Dylan was age eleven when he died. Erica, Stevens's daughter, was shot in the back, but she managed to escape the massacre. Erica testified that Stevens told her mother, Glenda, before he killed his ex-wife that "[B]itch, I told you I would kill you one of these days." Stevens confessed to his wife, Lauren, that he had "just killed a family." Not only were acts of murder brutal, each family member and Heath were hunted down and forced to endure each person's murder one by one. Obviously, the jury was presented sufficient evidence to support the finding. In *Evans v. Thigpen*, 631 F. Supp. 274, 285 (S.D. Miss. 1986), the court stated that "[t]he mental anguish and psychological torture suffered by the victim prior to the infliction of the death-producing wound may be considered with respect to the 'heinous, atrocious or cruel' factor and make its application constitutionally unobjectionable." *See Nixon v. State*, 533 So.2d 1078, 1098 (Miss. 1987) (held that killing of wife was especially heinous, atrocious, and cruel, where shot were fired at husband in presence of wife, prior killing of wife). This issue is without merit.

## XI. WHETHER IT WAS ERROR TO LIMIT STEVENS'S VOIR DIRE?

¶130. Stevens contends the trial court erred in preventing or limiting his line of questioning on voir dire to rehabilitate some jury panelists who had expressed problems with inflicting the death penalty. On appeal, Stevens focuses on three jurors, Mary A. Williamson, Melville L. Cordua and Jackie N. Niven.

¶131. Juror Williamson, number 76, was questioned hypothetically by the attorney for Stevens whether her opposition to imposing the death penalty under any circumstances would be changed, "if the victims were two of your children." Juror Williamson responded that it may if it would bring them back. Stevens's attorney questioned her by asking, "[E]ven if it was somebody close to you?" Juror Williamson responded, "I still wouldn't do it." Juror Williamson clearly indicated that she would not vote to impose the death penalty even if the victim was someone close to her.

¶132. Juror Cordua, number 39, was asked by Stevens's attorney, "[A]re there any circumstances that you would impose the death penalty." Juror Cordua responded, "I'm sorry, I don't think I could put somebody to death or kill somebody like the district attorney said." Stevens's attorney posed the question to Juror Cordua, "[W]hat if it were circumstances like a person who was convicted of a crime already and he was in prison when he killed another." The State objected to the question as not being the facts of the case at hand. The trial court stated, "[H]e said he could not envision any circumstances." The trial court did not allow the question as being already answered.

¶133. Lastly on appeal, Stevens addresses Juror Nivens, number 9. Juror Nivens stated, "[N]o, I couldn't vote [for] the death penalty." When asked by Stevens's attorney whether there was any circumstances that might allow him to vote for the death penalty, Juror Nivens replied, "[N]one that I can think of know." The State objected to the questioning of Juror Nivens of how long he had that opinion. The trial court allowed Juror Nivens to be questioned if he had held that opinion of the death penalty for at least more than a month. Juror Nivens responded that he had held that opinion more than a month.

¶134. In *Witherspoon v. Illinois*, 391 U.S. 510, 515, 88 S.Ct. 1170, 1773, 20 L.Ed.2d 776 (1968), the United States Supreme Court stated that:

> [I]t cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' thereby affirmed that he could never vote in favor of it or that he would not consider doing so in the case before him."

The Court went on the hold:

> Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.

¶135. This Court has held that voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ballenger v. State*, 667 So.2d at 1250 (citing *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 2230 (1992), citing *Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020 (1976)) (quoting *Connors v. United States*, 158 U.S. 408, 413, 15 S.Ct. 951, 953 (1985)). *See also Foster v. State*, 639 So.2d 1263, 1274 (Miss. 1994). This Court has stated that the trial court should take a substantial role in conducting *Witherspoon* voir dire of the venire panel in capital cases. *Ballenger v. State*, 667 So.2d at 1250; *see Hansen v. State*, 592 So.2d 128-29; *Lockett v. State*, 517 So.2d at 1335.

¶136. Rule 3.05 of the Uniform Circuit and County Court Rules addresses voir dire examination of jurors. It provides as follows:

RULE 3.05 VOIR DIRE

In the voir dire examination of jurors, the attorney will question the entire venire only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked. Attorneys will not offer an opinion on the law. The court may set a reasonable time limit for voir dire.

¶137. This Court has directed that "notwithstanding a prospective juror's scruples, the court should inquire further whether the juror would follow its instructions and a fair verdict render according to the law and the evidence." *Hansen v. State*, 592 So.2d at128. *See also Gary v. State*, 472 So.2d 409, 421 (Miss. 1985)(reversed on other grounds). "The court may exclude the juror where it is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Hansen*, 592 So.2d at 128; *See Wainwright v. Witt*, 469 U.S. 412, 424-25, 105 S.Ct. 844, 852-53, 83 L.Ed.2d 841 (1985); *Pinkney v. State*, 538 So.2d 329, 345 (Miss. 1988). "Deference must be paid to the trial judge who sees and hears the juror." *Wainwright*, 469 U.S. at 426, 105 S.Ct. at 853. This Court in *Stringer v. State*, 500 So.2d 928, 943 (Miss. 1986), stated that the trial judge's determination that a juror is biased will not be reversed where the determination is based on the record. In *Pinkney*, this Court in relying on the authority of *Stringer v. State*, stated that "the trial judge committed no error in excusing those jurors whose position on the death penalty was not unmistakably clear." *Pinkney v. State*, 538 So.2d at 344.

¶138. In other words, the test for determining when a prospective juror's views on the death penalty justify his removal is whether the trial court finds that the "juror's views 'would prevent or substantially impair the performance of his duties in accordance with his instruction and his oath'" and "is left with the impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt*, 469 U.S. at 426, 105 S.Ct. at 853; *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *Manning v. State*, 735 So.2d at 336-37; *Hughes v. State*, 735 So. 2d 238, 249-50 (Miss. 1999); *Manning v. State*, 726 So.2d at 1186-87; *Evans v. State*, 725 So.2d at 655-57; *Wells v. State*, 698 So.2d at 501-04; *Doss v. State*, 709 So.2d 369, 383-85 (Miss. 1996); *Jackson v. State*, 684 So.2d at 1222; *Simon v. State*, 688 So.2d 791, 798-801 (Miss. 1997); *Davis v. State*, 660 So.2d 1228, 1256-58 (Miss. 1995); *Foster v. State*, 639 So.2d at 1277-78; *Hansen v. State*, 592 So.2d at 128; *Willie v. State*, 585 So.2d 660, 672-72 (Miss. 1991); *Turner v. State*, 573 So.2d 657, 666-67 (Miss. 1990); *Pinkney v. State*, 538 So.2d at 345; *Lockett v. State*, 517 So.2d at 1334-35; *Fuselier v. State*, 468 So.2d 45, 53-55 (Miss. 1985).

¶139. "A jury selection procedure which gives the defendant 'a fair opportunity to ask questions of individual jurors which may enable the defendant to determine his right to challenge that juror' is proper." *McLemore v. State*, 669 So.2d 19, 25 (Miss. 1996) (quoting *Peters v. State*, 314 So.2d 724, 728 (Miss. 1975)).

¶140. The trial court has broad discretion in passing upon the extent and propriety of questions addressed to prospective jurors. *McGilberry v. State*, 741 So.2d 894, 912 (Miss. 1999); *Davis v. State*, 684 So.2d 643, 651-52 (Miss. 1996); *Jones v. State*, 381 So.2d 983, 990 (Miss. 1980).

¶141. We find nothing in the record that supports Stevens's contention that he was not given the

opportunity to rehabilitate jurors and denied a fair opportunity to conduct voir dire on any relevant issue. The trial judge stated: "I let you rehabilitate them all you wanted to...There's a certain limit on what you can do to rehabilitate them."

¶142. This issue is wholly without merit.

### XII. WHETHER IT WAS ERROR FOR THE COURT TO ALLOW PREJUDICIAL HEARSAY TESTIMONY?

¶143. Stevens finally alleges that the trial court erred by allowing hearsay testimony through witness, Officer Tim Singley of the Marion County Sheriff's Department. Officer Singley testified that Stevens's wife, Lauren, told him the location of the shotgun in a tree which she learned from Stevens, and she took Officer Singley to the site. Stevens's attorney, Mr. Sweatt, stated "[Y]our Honor, we'd object to the hearsay portions of the statements. They're objectionable and should be stricken from the record." The trial court sustained the objection and struck the testimony from the record. Stevens' attorney requested a mistrial. The trial court instructed the jury to disregard any statements that were made by a third party and the specifics of those statements. The trial court did not grant a mistrial but kept the objection under advisement. The trial court stated in the record that:

> I'm going to keep that motion under advisement and see whether there is, as the trial unfolds, if there is prejudicial..I mean, if it is prejudicial. If that the only way that gets in, it may be that we'll have a mistrial in the case.

¶144. After Lauren testified on direct examination as a witness for the State regarding: (1) how she learned of the shotgun's location, and (2) that she had told Officer Singley how to locate the shotgun, the trial readdressed the issue of mistrial.

¶145. The trial court stated:

> **THE COURT**: I think we have a motion still pending that I'm ready to rule on. We'll get that in the record.
>
> There was a motion for mistrial that had been made earlier concerning testimony of Officer Tim Singley. Based on the testimony that I've heard today [testimony of Lauren Stevens], that motion will be overruled, and there will be no mistrial in the matter.

¶146. On the motion for directed verdict after the State had finally rested, Stevens's attorney again raised the motion for mistrial which the trial court had denied. The record states as follows:

> **MR. SWEATT**: Also, there was a motion for a mistrial during Tim Singley's testimony for bringing out an inculpatory phrase through double hearsay. The Court overruled that motion, and we -
>
> **THE COURT**: I didn't overrule the motion until after the testimony of Mrs. Stevens. I think is was correct, it was inadmissible at that point in time. And I did instruct the jury to disregard it and sustained your objection after your objection was made.
>
> And I think that it doesn't matter now that she did testify and testified the same thing that was testified by him.

¶147. The issue of husband and wife privilege raised here again on appeal by Stevens has previously been addressed. Stevens on appeal also argues that the testimony from Officer Singley regarding Lauren Stevens's statements is hearsay. The trial court already found that there was hearsay and sustained the objection, ordered the record stricken and instructed the jury to disregard any third party statements. The trial court in the case sub judice admonished the jury and offered to add any instruction to the jury that Stevens' attorney could suggest. "This Court has repeatedly and consistently held that such action is sufficient to remove any prejudice resulting from the improper testimony." *Holly v. State*, 671 So.2d 32, 38 (Miss. 1996) (quoting *Baine v. State*, 604 So.2d 249, 256 (Miss. 1992)). *See also Dennis v. State*, 555 So.2d 679, 682-83)(Miss. 1989); *Marks v. State*, 532 So.2d 976, 982 (Miss. 1988) (refusal to grant mistrial was proper where the trial court sustained an objection and instructed the jury to disregard improper testimony). "Absent unusual circumstances, where objection is sustained to improper questioning or testimony, and the jury is admonished to disregard the question or testimony, We will not find error." *Wright v. State*, 540 So.2d 1,4 (Miss. 1989).

¶148. In the case sub judice, the trial court withheld ruling on the motion for mistrial until the court heard the testimony of Lauren Stevens. Lauren's testimony directly supported the testimony of Officer Singley which amounted to hearsay. In other words, the testimony of Officer Singley regarding what Lauren had told him was the same testimony provided by Lauren herself.

¶149. This issue is without merit. Any error here is harmless error at best. We find that the trial court properly sustained the objection to hearsay and admonished the jury to disregard the third-party statements.

### XIII. IS THE IMPOSITION OF THE DEATH PENALTY EXCESSIVE OR DISPROPORTIONATE IN THIS CASE?

¶150. Miss. Code Ann. § 99-19-105(3) (2000) requires this Court to perform a proportionality review when affirmed a death sentence in a capital case. Section 99-19-105(3) states:

(3) With regard to the sentence, the court shall determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; (b) whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; (c) Whether the sentence of death is excessive of disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstances was harmless error, or both

¶151. After reviewing the record in this appeal as well as the death penalty cases listed in the appendix, we conclude that Stevens's death sentence was not imposed under the influence of passion, prejudice, or any other factor. We also find that the evidence is more than sufficient to support the jury's finding of statutory aggravating circumstances. Further, comparison to other factually similar cases where the death sentences was imposed, the sentence of death is neither excessive nor disproportionate in this case. Finally, we find that the jury did not consider any invalid aggravating circumstances. Therefore, this Court affirms the death sentence imposed in this case.

## CONCLUSION

¶152. For these reasons, the judgment of the Marion County Circuit Court is affirmed.

¶153. **CONVICTION OF FOUR COUNTS OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED. CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**BANKS AND McRAE, P.JJ., SMITH, MILLS, WALLER, COBB AND DIAZ, JJ. CONCUR. PITTMAN, C.J., CONCURS IN RESULT ONLY.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Mitchell v. State,* -- So.2d -- (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987)***, Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (continued

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

**Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

**Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State***,** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

**Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

### <u>(continued)</u>

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.